NORTH AMERICAN NATIONAL INSURANCE COMPANY, Appellant, v.
V. A. HOLSTRUM et al., Appellees.

No. 38239.

SEPTEMBER 28, 1928.

REHEARING DENIED APRIL 5, 1929.

*Bradshaw, Schenk & Fowler* and *F. J. Lund*, for appellant.

*Henderson & Jones* and *John J. Henneberry*, for appellees.

EVANS, J.—The case involves certain transactions of corporate-stock sales made through stock salesmen as a part of the promotion of the corporation. The plaintiff represents certain predecessor corporations, and came into existence as such after the transactions which are involved in the litigation. The original predecessor was Farmers Crop Insurance Company, incorporated in 1918, under a capital of $100,000. In the spring of 1919, the articles of this corporation were amended so as to increase the capital to $500,000 and to authorize the issuance of fire in-

surance policies and to change the name to North American Fire Insurance Company. In March, 1919, a stock-selling campaign was carried forward, and the entire stock was sold within a few weeks. The stock was sold at $200 per share, the sum of $100 being denominated as capital, and $100 as surplus. Immediately thereafter, the articles were again amended, so as to increase the capital to $750,000. Substantially all the additional amount was either sold or contracted for. Thereupon, the same group of promoters organized a sister corporation, denominated the Great Republic Re-Insurance Fire Company, with an authorized capital of $1,000,000. Substantially all of this was sold at $200 per share within the same year. The actual subscriptions to the latter corporation amounted to $1,981,700. Shortly thereafter, the articles of this corporation were amended so as to change the name to Great Republic Fire Insurance Company, whereby it abandoned its proposed reinsurance business, and became a fire insurance company only, undertaking precisely the same functions as those of the North American Fire Insurance Company.

In 1923, these two companies were consolidated and reorganized under the name of North American National Insurance Company. By the agreement of consolidation, the consolidated company assumed all the liabilities and obligations of each of the constituent companies. Such consolidated company is the plaintiff herein. Its liability for the obligations of its predecessors is predicated upon the merger agreement. Its right to the mortgage in suit is predicated upon the same agreement. The defendant herein was a farmer, occupying his farm of 160 acres. In March, 1919, he became the purchaser of 25 shares of the North American Fire Insurance Company at $200 per share. His subscription was obtained by a certain stock-selling agent, and induced by representations made by him. In early May, this agent returned, and obtained his subscription for 25 additional shares, for the same price. On May 30th, he came again, and upon certain representations then made, obtained the defendant's subscription for 50 additional shares at $200 per share. For the purchase price, amounting to $20,000, the defendant had executed his notes, and delivered the same to such agent. For one fourth of the amount of each subscription, the defendant was required to execute a note payable to "myself." The remaining notes were drawn payable to the corporation. The "myself"

notes were all negotiated and appropriated as agent's commissions, and were later paid by the defendant in the hands of innocent purchasers. In October, 1919, the salesmen of the Great Republic Re-Insurance Company procured the defendants' subscription for 50 shares of the Great Republic stock, at $200 per share. In November, they obtained his subscription for an additional 50 shares, at the same price. The sum total of the notes obtained from the defendant was $40,000, of which the sum of $10,000 was in the form of "myself" notes, on short time, which were all appropriated as commissions, as heretofore stated. The last transaction of purchase of 50 shares of stock was rescinded by mutual agreement in May, 1923, by the surrender to the defendant of his notes for $7,500, and by his sustaining a loss of $2,500, which sum had been paid by him and appropriated as commissions. The amount of his notes remaining unpaid was $22,500, for which the plaintiff herein, as the consolidated company, obtained a mortgage, in August, 1920, which mortgage is the one in suit. The claim of the defendant is that the mortgage was obtained by a repetition of the same false representations as had induced the execution of the notes.

For reasons hereinafter appearing, we shall not deal with the details of the evidence or of the specific false representations. One of the reasons given to the defendant by the salesmen for the organization and promotion of the Great Republic Company was that the business of the North American was so overwhelming that some provision had to be made for the overflow; that the reinsurance business to result from the surplus business of the North American was highly profitable, and that it was highly desirable to keep it, rather than to let it go to foreign companies.

In the course of the stock selling, and before any business had been done by either company (May 26, 1919), the directors entered upon their records a resolution fixing the price of the stock of the North American at $250, with permission to president and secretary to increase it still further to the sum of $300 per share. The record discloses no legitimate reason for such a resolution. The inference may fairly be drawn from the record as a whole that its only purpose was to aid the stock salesmen and to support them in exaggerated representations of value. It appears, inferentially at least, that some sales were made at $250 and $300 per share. But these sales were made through repre-

sentations by the agents. The stock thus sold purported to be that of previous purchasers. None of the premium ever inured to the benefit of the corporation. The corporation never received more than $150 per share, over and above the commissions.

The inference may also fairly be drawn from the record that, in the organization of the Great Republic Re-Insurance Company, the promoters never intended to do any reinsurance business. Though it appears that stock subscriptions were obtained for this company amounting to $1,981,700, yet it appears also that the total amount credited to the corporation of the proceeds of these subscriptions was $484,000; whereas the selling agencies received and retained a sum of more than $495,000. This great discrepancy between the amount of stock subscriptions and the amount of capital assets realized therefrom is partly accounted for by the canceling of subscriptions. It appears that a large number of subscriptions were "canceled out," upon the request or demand of the subscriber. Such cancellation applied only to three fourths of the subscription, and usually involved a loss to the subscriber of the amount of his "myself" notes, which had been appropriated as commissions. The sum of the situation was that the purported paid-up capital consisted of $1,981,000 of promissory notes. If we take this defendant's case as an example, the amount of these notes was beyond the ability of the maker to pay. One of the inducing representations made to the maker was that the notes would never have to be paid. The very magnitude of the transaction into which the maker had been drawn, rendered him practically insolvent. The payment of the "myself" notes, which was diligently exacted, exhausted the resources of the maker, and left the corporation with a horde of insolvent subscribers to stock. The very scheme of the promotion worked the insolvency. This insolvency was the quagmire upon which the working capital of the company was built. The foregoing observations are mere bird's-eye views of some of the phases of the transaction under consideration. We have set them forth for the purpose of showing the pertinency to the case at bar of what we have said in another case. The other case, involving the same plaintiff in another transaction, is *North American Nat. Ins. Co. v. Holstrum*, 208 Iowa ——.

In the cited case, we had occasion to make careful examination of a large record, involving a transaction similar to the one

now under consideration, in all material respects. Our opinion in such case was filed shortly before the submission of the case at bar, but after the arguments therein had been filed. The following excerpts from our opinion in that case will indicate the pertinency of our holding therein to the case at bar. We said therein:

"Appellee testified that Johnstone said he was the field man for the company, and assisting Ferrell in securing subscriptions for stock; that he displayed a clipping from a Chicago paper, stating that foreign reinsurance was a thing of the past in this country, and congratulating the president of the Great Republic Company on the fact that he was launching out and starting a reinsurance company; that its earnings would be a high percentage (figures from some German companies were quoted, showing an annual profit of 400 per cent); that Johnstone stated that German companies could no longer operate in this country, and that it was not often a person could avail himself of the opportunity to buy stock in a concern such as the Great Republic Reinsurance Company. He further testified that Johnstone said that he really did not have authority to sell stock to a nonsubscriber for stock in the original North American, but that his special authority as field man led him to offer 50 shares. Appellee further testified that Johnstone said that the value of the stock was going up rapidly; that little remained for sale; that it would reach $250 per share; that it would go to $300; that it was selling on the curb in Des Moines for $250 per share; that it would soon be selling for $300; that 50 per cent of the proceeds of the sale would go into the treasury of the company, and the other 50 per cent would be paid to the insurance department, for the protection of subscribers; that the agents were getting their pay, whether they sold stock or not. Johnstone, so appellee testified, agreed to resell 75 per cent of the stock for $300 per share. An agreement to that effect, he said, was written on the margin of the subscription blank. * * * Much stress is laid in argument upon the feverish financial conditions prevailing in 1919 and 1920, and the depression that soon followed. This argument works both ways. The psychological conditions that gave abnormal stimulus to investments were easily made the instrumentality of all kinds of speculators, to bring about the organi-

zation of apparently promising business concerns which might be promoted at tremendous profit. The effect upon the victim was no less disastrous than it was upon the promoter. Many of the representations made to appellee were wholly false. Some of them were not. He was at the time about 44 years of age, a farmer, with little or no knowledge of the insurance business. That he accepted and believed the extravagant statements and representations of the sales agents we have no doubt. Every officer and agent of both companies must have known the nature and character of the assets thereof, the possibility of engaging in business, earning dividends, etc. Some of the representations referred to future achievements of the organizations; but the whole series of statements made to induce appellee to subscribe for stock were closely interwoven, and must be considered together,—that is, the whole scheme must be taken into consideration. Perhaps the organizers of both companies hoped for better results, but the method of doing the business indicated the lack of proper regard for the safety of its investors, and the promises made during the period of great inflation were not, and perhaps could not have been, safeguarded. Some of the officers were experienced insurance men. Many were not. We have no difficulty in reaching the conclusion that all of the subscriptions for stock, notes executed, and payments made at or about the time, were fraudulently procured.''

From a reading of the record in the present case, we find it impossible to differentiate between the two cases in their controlling facts so as to justify an affirmance in the former case and a reversal in this one. The general scope and character of the inducements and representations made in each case were identical. We shall not, therefore, add to our former discussion of details.

The relief awarded in the district court was the allowance of damages to the amount of approximately $100 per share, as a credit upon the notes. This form of relief was awarded because the defendant had parted with his stock, the same being already in the hands of the plaintiff, and he was not able to avail himself of the remedy of rescission. Under the evidence, we think the amount of damage awarded was proper.

In conclusion, it is proper to say that the strictures here

made upon the promoters of the company are not applicable to the personnel of the present management. Nor are they wholly applicable to *all* the original promoters. The fact remains that the selling of stock was intrusted to irresponsible agents, whose capacity for falsehood was colossal, and who were stimulated to the highest limit of such capacity by a proffer of compensation contingent in character and extravagant in amount.

We reach the conclusion that the decree below must be— *Affirmed.*

STEVENS, C. J., and FAVILLE, KINDIG, and WAGNER, JJ., concur.